USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/19/05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

JOHN M. MURPHY, et al.

                Plaintiffs,

    -against-

KOREA ASSET MANAGEMENT
CORP., et al.,
                Defendants.

----------------------------------------------------------------X

04 Civ. 2598 (RJH) (HBP)


**OPINION AND ORDER**

       This action stems from the bankruptcy of Hanbo Iron & Steel Co., Ltd. ("Hanbo" or "Hanbo Steel"), a bankruptcy so colossal that, by many accounts, it precipitated the so-called "Asian financial crisis" of the late 1990's. At one time Korea's second-largest steel manufacturer, as well as a prominent member of a leading Korean conglomerate, or "chaebol," Hanbo collapsed in January 1997 under more than $6 billion of debt, most of which was associated with a single capital project called the "Dangjin Works Facility." As Hanbo's debt declined in value, much of it was acquired by a state-created entity known as the Korea Asset Management Corporation ("KAMCO"). Ultimately, KAMCO was to become Hanbo's largest creditor, and would play an important role in the company's bankruptcy, as well as the eventual sale of its assets at international auction.

       Derivative plaintiff John M. Murphy, acting on behalf of AK Capital, LLC ("AK Capital"), now contends, *inter alia*, that KAMCO fraudulently misled AK Capital and conspired against AK Capital in connection with the Company's failed attempt to purchase Hanbo's assets at one such auction. In particular, Murphy contends that

KAMCO made several false representations to AK Capital, including (1) that KAMCO would have *de facto* control over the auction; (2) that if AK Capital were the successful bidder, KAMCO would use its best efforts to help AK Capital consummate the purchase; and (3) that a $10 million earnest money deposit would be the maximum required up-front payment. Murphy further alleges that KAMCO conspired to defraud AK Capital and to prevent it from closing on the sale and purchase agreement, and that KAMCO tortuously interfered with the sale and purchase agreement. For these alleged wrongs, plaintiffs seek $1 billion in actual and punitive damages.

By motion dated June 11, 2004, KAMCO moved to dismiss the case, arguing that (1) KAMCO is an organ of the Korean government, and therefore entitled to immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1601, *et seq.* (the "FSIA"); (2) the doctrine of *forum non conveniens* precludes plaintiffs' case from being heard in this jurisdiction; (3) the complaint does not comply with Local Rule 23.1 and Fed. R. Civ. P. 9(b); and (4) the complaint does not state a claim under Korean law, which would control the action. Murphy opposed the motion on all grounds and also asked the Court to conduct an evidentiary hearing before ruling, indicating at one point his belief that a hearing was "imperative" given the "critical factual disputes" presented by KAMCO's motion. (Pl. Opp. to KAMCO's Mot. to Dismiss, p. 14 ("Opp. Memo."); Pl. Sur-Reply, p. 4).

On April 28, 2005, the Court granted Murphy's motion for an evidentiary hearing, but only with respect to the issue of FSIA immunity.[1] Less than one month later, by

---

[1] The Court granted the motion in recognition of the Second Circuit's observation in *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales* that it is "essential for the district court to afford the

2

letter dated May 19, Murphy advised the Court that – upon further consideration – he did not believe a hearing would be necessary, at least with respect to the issue of FSIA immunity. (May 19, 2005 Letter from Herald Price Fahringer to the Court). That same day, KAMCO likewise notified the Court that it did not think an evidentiary hearing was needed. On this basis the Court proceeded to the merits of the motion and, on September 30, 2005, issued an order dismissing the case on the ground that KAMCO is entitled to FSIA immunity.

The basis for the Court's ruling is set forth below.

## FINDINGS OF FACT

A motion to dismiss premised on FSIA immunity is equivalent to an attack on a court's jurisdiction, which means that this Court must look outside the pleadings in resolving KAMCO's motion. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 n.6 (2d Cir. 2001) (explaining that "[a] district court 'may' consult evidence to decide a . . . motion [premised on FSIA immunity but it] 'must' do so if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction"). In this case, the parties have submitted substantial evidence on the issue of FSIA immunity, including testimony from two experts, and several individuals who were involved in AK Capital's attempt to purchase Hanbo's assets.[2]  Having considered this evidence, as well

parties the opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction." *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 748 (2d Cir. 2000).

[2] For ease of reference, the Court sets forth in this footnote the nine individuals who have submitted testimonial evidence in connection with KAMCO's motion. Three individuals have submitted affidavits or declarations in *opposition* to KAMCO's motion: Je Wan Kim, an expert in Korean law, is a professor at the College of Law at Korea University; John M. Murphy, the derivative plaintiff in this suit, was involved in Hanbo's attempted asset sales via his "membership" in AK Capital and his friendship with Alex Kwon, the principal of AK Capital; and Howard M. Cohen, who participated in a failed private sale to Alex Kwon as Kwon's counsel. In addition, six individuals have submitted affidavits or declarations in *support* of KAMCO's motion: Jinsu Yune, an expert in Korean law, is a former Korean judge, and is currently a

3

as the parties' memoranda and supporting material, the Court makes the following factual findings.

## A. Hanbo's Bankruptcy

Hanbo Iron & Steel Co., Ltd. rose to become Korean's second largest steel maker through a series of aggressive expansions. In 1990, Hanbo began work on the most ambitious and capital-intensive of these projects, the Dangjin Works Facility. If completed, the Dangjin plant was to be the company's crown jewel – one of the world's largest and most technologically advanced steelworks. (June 11, 2004 Decl. of Seung-Soon Choi, ¶ 12 ("Choi Decl.")). While under construction, however, the debt required to finance the project left Hanbo vulnerable to sudden shifts in the economy. In 1996, as the facility neared completion, Hanbo was hit with a disastrous one-two punch: the world steel industry entered into a recession at the same time the Korean economy began to lag. Despite a series of emergency loans from major Korean banks, in early 1997 Hanbo collapsed under more than $6 billion of debt.[3]

On January 23, 1997, Hanbo filed for corporate reorganization with the Bankruptcy Division of Seoul Central District Court (the "Bankruptcy Court"). As was standard practice, the Bankruptcy Court immediately appointed a trustee (the "Trustee")

professor of law at Seoul National University; Kyung-Ho Song is the acting managing director at KAMCO; Jae-Ho Park is an Executive Director at KAMCO; Seung-Soon Choi is a Korean attorney, and partner at Yoon & Yang, Hanbo's lead counsel during a proposed private asset sale to Kwon; Dae-Sung Kim is the general manager of the litigation department of KAMCO; and Kyung-Man Huh is a former employee of KAMCO.

[3] Hanbo's bankruptcy was international news, both because it was one of the largest in Korean history and because, by many accounts, it precipitated the so-called "Asian financial crisis." *See, e.g.,* Roger du Mars, *Hanbo on Sale Fast Track,* THE DAILY DEAL, May 28, 2004 ("Hanbo . . . was one of the precipitating bankruptcies of the Asian financial crisis"); Charles Smith, *Yamato Kogyo Eyes Hanbo Corp.,* THE DAILY DEAL, June 28, 2002 ("Hanbo['s] . . . collapse[] . . . helped kick off the Asian financial crisis."). The bankruptcy also attracted a great deal of national interest amid speculation that top Korean officials had forced several Korean banks to extend credit to keep Hanbo afloat, even after it became clear that bankruptcy was inevitable.

4

and empanelled a Representative Creditor Board (the "Creditor Board") to oversee the bankruptcy proceedings. The Trustee acted as a liaison between the Bankruptcy Court and the Creditor Board. In that capacity, the Trustee would submit regular reports to the Court on the progress of the effort to dispose of Hanbo's assets; the Trustee would also communicate the Court's instructions to interested parties, including the Creditor Board. (Choi Decl., ¶ 15). The Creditor Board, in turn, was composed by representatives from thirty-five of Hanbo's institutional creditors. Together, the Trustee and the Creditor Board would manage the day-to-day bankruptcy process.

As Hanbo's largest creditor and a leading member of the Creditor Board, the defendant in this case, KAMCO, would figure prominently in that process.

### B.    KAMCO

The Korea Asset Management Corporation was established by the Korean government on April 6, 1962, with passage of the Korea Development Bank Act ("KDBA"). Under the terms of the KDBA, KAMCO was to be a subsidiary of the Korea Development Bank ("KDB"), and would have three primary functions: to manage properties owned by the Korean government, to collect certain unpaid tax liabilities, and to liquidate KDB's non-performing assets. (June 10, 2004 Declaration of Kyung-Ho Song, p. 2 ("Song Decl.")). For the next thirty-five years, until the onset of the Asian financial crisis, these functions would remain largely unchanged.

In 1997, with the Korean economy failing, the government reorganized KAMCO pursuant to the Act on Efficient Disposal of Non-Performing Assets of Financial Institutions and Establishment of Korea Asset Management Corporation (the "KAMCO Act"). (*Id.*; *see also* Jan. 1, 2005 Second Decl. of Je Wan Kim, ¶ 31 ("Second Kim

5

Decl.")). Under the KAMCO Act, KAMCO was newly empowered to (i) to support and normalize distressed financial institutions by monitoring and resolving operational difficulties; and (ii) to perform the role of a "bad bank," *i.e.* to facilitate corporate recovery, to minimize taxpayer costs, and to recover public funds by efficiently disposing of non-performing loans. These objectives were memorialized by KAMCO's new mission statement: "to accelerate the resolution of non-performing assets held by financial institutions, and to efficiently support the management normalization, etc. of the enterprises showing signs of insolvency." (KAMCO Act, Art. 6, attached as Ex. 2 to Song Decl.).

To facilitate and finance these objectives, the KAMCO Act created the Non-Performing Loan Resolution Fund (the "Resolution Fund"), and gave KAMCO the exclusive authority to control and manage the Resolution Fund, as well as any non-performing loans it acquired. (Song Decl., p. 2). The Resolution Fund was initially infused with 21.6 trillion Korean Won, most of which came from the issuance of government-guaranteed bonds. KAMCO, by contrast, is a corporation wholly owned by its shareholders, which include the Korean government (42.8%) and the Korea Development Bank (28.6%), an agency of the Korean government, as well as a group of private Korean banks (28.6%). (KAMCO Act, Arts. 10, 11; Second Kim Decl., ¶ 17; Song Decl., p. 2).[4]

KAMCO shares other characteristics with a typical corporation. It has a board of directors, officers, and employees (KAMCO Act, Arts. 17, 22); it also has 1 trillion

---

[4] All figures are as of June 10, 2004. The private banks include Kookmin Bank, Woori Bank, Hana Bank, and Export Import Bank. (Second Kim Decl., ¶ 17).

Korean Won of "authorized capital," (KAMCO Act, Art. 9), and a paid-in capital of 140 billion Won. (Second Kim Decl., ¶ 17). In at least one respect, KAMCO also "behaves" like a typical for-profit corporation: in order to achieve its purpose of "resolv[ing] . . . nonperforming assets held by financial institutions," KAMCO engages "distressed debt professionals" to repackage and sell non-performing loans to domestic and international investors in a variety of ways, including by issuing asset-backed securities, conducting international auctions, or by establishing asset management corporations. (KAMCO Act, Art. 26; Song Decl, p. 11); *see, e.g., Steinhardt Group, Inc. v. Citicorp*, 1996 WL 790097, at *1 (D. Del. Dec. 2, 1996) (describing how Citicorp devised a plan to "securitize" its non-performing assets by selling them to limited partnerships outside the banking industry). In 2003, KAMCO generated a modest profit of approximately $19 million. (Oct. 11, 2004 Decl. of Je Wan Kim, ¶ 70 ("J. Kim Decl.")).

Nonetheless, in many respects KAMCO does not actually operate as a "for profit" corporation. In using the Resolution Fund to acquire non-performing loans, KAMCO, after consultation with government authorities, negotiates prices that are substantially in excess of what the loans are worth on the open market – in effect subsidizing the holder of the bad debt. (Song Decl., ¶ 12). Perhaps of greater significance (at least for purposes of FSIA immunity), profits and losses associated with the acquired non-performing loans – including those associated with Hanbo's debt – are not accounted for on KAMCO's financial statements, and any profits from such loans are distributed to the institutions that contributed money to the Resolution Fund, not to KAMCO's shareholders. (Nov. 25, 2004 Reply Decl. of Jinsu Yune, ¶ 10 ("Yune Reply")). Moreover, the distribution of any profits arising from KAMCO's other operations is subject to further limitations not

applicable to for-profit corporations. (*Id.*). Collectively, these restrictions and limitations reflect the fact that, whatever KAMCO's similarities to a typical corporation, it performs several functions most often associated with – and in most cases reserved for – governments or their agencies.

First, as noted at the outset, KAMCO is vested with the exclusive authority to oversee and control a public fund backed by government securities, the Resolution Fund. In this capacity, KAMCO is responsible for recovering "public funds" by acquiring and disposing of non-performing assets, and otherwise promoting financial stability by supporting and normalizing distressed financial institutions. Second, under the Korean National Tax Collection Act and the Korean Customs Act, KAMCO is authorized to conduct public auctions of property seized by the Korean Tax Authority ("KTA") or the Korean Customs Authority ("KCA"). (Yune Reply, ¶ 11). Indeed, when conducting such auctions, KAMCO is considered to actually *be* the KTA and the KCA for at least one purpose: KAMCO is potentially subject to suit as an *administrative agency* under the Korean Administrative Litigation Act ("ALA") for actions taken while conducting auctions. (*Id.*; ALA, Ex. 12 to Yune Reply). Finally, under Korea's State Properties Act, the Ministry of Finance and Economy may entrust KAMCO with works concerning administration and disposal of certain properties owned by the Korean government. (*Id.*, Ex. 15).

KAMCO also receives certain benefits under the KAMCO Act not available to a typical corporation. For example, under Article 33(3) of the KAMCO Act, the government may "guarantee the repayment of principal and interest of debentures issued by . . . KAMCO"; pursuant to Article 46, KAMCO is exempt from paying certain

specific taxes, such as acquisition and securities transaction taxes, and also potentially benefits from any other tax relief that the national or local governments deem "necessary" for KAMCO's welfare; and under Article 9(3), "[t]he government may, when it is deemed necessary to support the performance of KAMCO's services, make a capital investment in KAMCO or support necessary expenses." This last provision essentially means that the Korean government can assume KAMCO's debts, pay its employees, or provide any other financial support it deems necessary. (Yune Reply, ¶ 22).

Moreover, precisely because KAMCO performs these governmental functions, and receives these special benefits, it is subject to far more oversight and control than a normal corporation. To begin, KAMCO is supervised by the Korean Financial Supervisory Commission ("FSC"), an agency of the Korean government, which itself reports directly to the President of Korea. (KAMCO Act, Arts. 47, 48). The FSC has the authority to appoint and remove KAMCO's auditor, and also has *ex post facto* authority to approve or reject KAMCO's "Managing Director" or CEO after selection by its shareholders. (KAMCO Act, Art. 17; Yune Reply ¶¶ 4(d), 12). The FSC also collects and reviews the Resolution Fund's annual closing statement, balance sheet, and income statement at the end of each fiscal year. (Song Decl., p. 4; Yune Reply, ¶ 13). KAMCO's control of the Resolution Fund also subjects it to the supervision of the Public Fund Oversight Committee of the Ministry of Finance and Economy, as well as the auditing authority of Korea's National Assembly's Board of Audit and Inspection ("BAI"), which is responsible for auditing all agencies of the Korean government. (Song Decl., p. 5; Yune Reply, ¶¶ 4(e), 9, 14). And because KAMCO is subject to audit by the

9

BAI, it is also subject to annual inspection and special investigation by Korea's National Assembly. (Yune Reply, ¶ 17).

Even more significantly, KAMCO is required to pass all resolutions concerning amendments to its operational policies, including its policies for the Resolution Fund, through a Management Committee composed of eleven members, including public officials from Korea's Ministry of Finance and Economy, Ministry of Planning and Budgeting, the Korea Development Bank, and the Financial Supervisory Service, which is the executive arm of the FSC. (KAMCO Act, Art. 14; Yune Reply, ¶¶ 4(c), 15). And under certain circumstances, KAMCO is subject to the Korean Framework Act on the Management of Government Affiliated Institutions ("FAGAI"), pursuant to which its management objectives, business plans, and budgets are subject to adjustment and review by the Korean government. (Yune Reply, ¶ 5(a)).

Taking a broader view of these facts, it is clear that KAMCO acts – in many, if not most respects – as would any agency of the Korean government. The question, of course, is whether KAMCO is *enough* like an agency to qualify as an "organ" of the Korean government, as that term is used in the Foreign Sovereign Immunities Act. Before resolving that issue, however, the Court must provide some context for KAMCO's role *in this case*, which takes us back to the events surrounding Hanbo's bankruptcy.

### C. The First Auction

As noted, *supra*, the Korean government dramatically expanded KAMCO's role at about the same time that Hanbo collapsed. The expansion was not coincidental. To the contrary, KAMCO was reorganized in 1997, in part, to acquire the billions of dollars

10

of non-performing loans issued to Hanbo, including almost $8 billion of loans from the Korea First Bank and Seoul Bank. And it did just that, becoming Hanbo's largest creditor by the time the Creditor Board was empanelled in 1997. On this basis, KAMCO was appointed the "primary representative" of the Board, which meant that a KAMCO executive sat as the chair of the Joint Management Committee, a subcommittee of the Board comprising Hanbo's eleven largest creditors. (Kyung-Ho Song Decl., p. 6).[5] In addition, a KAMCO employee served as chief of the "Sales Bureau," which was created in 2001 by the Joint Management Committee and the Trustee to implement the Joint Management Committee's directives and to oversee the day-to-day activities relating to the disposition of Hanbo's assets. Although all decisions were ultimately subject to the approval of the Bankruptcy Court, KAMCO was effectively the creditors' representative. (*Id.*, p. 7; Choi Decl., ¶¶ 28-30)).

By 1998 the Creditor Board (led by KAMCO) had decided that Hanbo's assets would be sold at a public auction (the "First Auction"). At the close of the First Auction a group of investors known as the "Nabors Consortium" was selected as the preferred bidder, and, on March 8, 2000, entered into a sale and purchase agreement (the "Nabors SPA") for Hanbo's assets. Although the transaction was not set to close until September 30, 2000, the Creditor Board did not require the Nabors Consortium to put down an earnest money deposit (or for that matter any other non-refundable security). Thus, when the Consortium backed out of the Nabors SPA before the deal closed, the Creditor Board

---

[5] The other members of the Joint Management Committee were the Korea Development Bank, Chohung Bank, Korea Exchange Bank, Woori (Hanvit) Bank, Hana (Seoul) Bank, Allianz Life Insurance, Seoul Guarantee Insurance, Daewoo Securities, KDB Capital and Korea Development Leasing Corporation.

11

was left without financial recourse. (*See* September 30, 2000 letter from Kwon to KAMCO ("Kwon Letter"), attached as Ex. A to Decl. of Dae-Sung Kim ("Kim Decl.")).

### D. The Proposed Private Sale

Soon after the Nabors SPA fell through, the Creditor Board received a competing offer for Hanbo's assets. By letter dated September 30, 2000, a Korean national named Ho-Sung (Alex) Kwon offered to assume the Nabors SPA and purchase Hanbo's assets outright in a private sale. (September 30, 2000 Kwon Letter). Kwon's offer was by no means happenstance; at the time the Nabors Consortium was formed, Kwon was its largest shareholder. (*See* Kim Decl., p. 2; *see also* Request for Provisional Seizure of Credits, attached as Ex. C to November 24, 2004 Supplemental Decl. of Seung-Soon Choi ("Choi Supp. Decl.")). Kwon is also the son of Chul-Hyun Kwon, a Korean steel magnate and founder of Union Steel Co., Ltd, a prominent Korean steel manufacturer. He was, in short, a credible suitor.

Kwon's letter explained that the Consortium attempted to exclude him because he refused to agree to immediately resell Hanbo to a third party, an intention he characterized as "impure." (*Id.*). By contrast, Kwon stated that it was his desire to "re-establish" Hanbo as a "leading domestic steel company." Kwon also pointed out that a direct sale would be far quicker than a second public auction. Kwon followed up his September 30 letter with an October 3, 2000 visit to the offices of the Hanbo Divesture Task Force, where he further discussed his proposal for assuming the terminated contract. (Kim Decl., ¶ 10). During the October 3 meeting, which was held in Korea, Kwon noted that he was in the process of negotiating an assignment of the contract with the Nabors Consortium, and explained why he felt he was in the best position to purchase Hanbo's

assets. (*Id.*, ¶ 11). Although it is not clear exactly how the creditors viewed Kwon's proposal, there was enough interest on both sides to discuss the offer on at least one additional occasion.

On October 13, 2000, Kwon met with KAMCO representatives at the Palace Hotel in New York City to present the terms of his offer. (November 24, 2000 Decl. of Kyung-Man Huh, ¶ 11 ("Huh Decl.")). It was not an informal meeting – both sides were represented by financial and legal advisors. Kwon was represented by attorneys Howard Cohen, Marshal Lester and William E. Sudow, as well as Fred Gorsetman, a financial consultant, and Chuck Bradford, a steel industry consultant. In addition, derivative plaintiff John M. Murphy attended the meeting, albeit as an advisor to Kwon.[6]

KAMCO was also represented at the meeting by legal counsel – David Yu of Daeryook International, a Korean law firm, and David Goldman of McDermott, Will & Emery (Cohen Aff., ¶ 2; Huh Decl., ¶ 10) – and also by several officers and employees: Kyu-Jim Kim, a KAMCO Senior Manager, Jong-Jin Lee, head of KAMCO's restructuring fund team, and Kyu-Man Huh, a Deputy Vice President for KAMCO. Although Huh was authorized by the President of KAMCO, Jae-Ryong Chong, to meet and discuss the terms of a private sale with Kwon, (Murphy Decl., ¶¶ 11-12), he had little

---

[6] The Court finds that Murphy attended the October 13, 2000 meeting solely as an advisor to Kwon. In his affidavit Cohen claims otherwise, stating that Murphy attended the meeting as a "principal" of "AK Capital." (October 14, 2004 Decl. of Howard M. Cohen, p. 2 ("Cohen Decl.")). But Murphy himself is not so sure. Although he claims to have been "an integral part of the negotiations for the purchase of Hanbo," (Murphy Decl., ¶ 2), his declaration indicates that his role in the meeting derived from – and did not extend beyond – his status as an advisor to Kwon. Indeed, Murphy characterizes himself as Kwon's "advisor on business and international matters," a position he has held for "more than 20 years." (Murphy Decl., ¶ 8). Murphy also notes that the purpose of the October 13 meeting was to "consider[] a private sale of Hanbo['s] . . . assets to Alex Kwon," which does not suggest that Murphy was to have a direct stake in any deal that resulted from the meeting. (Id., ¶ 12). On this basis, and despite Cohen's conclusory statement to the contrary, the Court finds that Murphy attended the meeting on Kwon's behalf. This conclusion is supported by the Court's finding, *see infra*, that the plaintiff in this action, AK Capital LLC, did not even exist as of October 13, 2000.

familiarity with the Hanbo bankruptcy proceedings, and was therefore not "authorized to negotiate the terms of a sale of Hanbo's assets to . . . Kwon." (Huh Decl., ¶ 9). Rather, Huh's role was limited to "receiv[ing] and discuss[ing] . . . Kwon's proposal." (*Id.*).

Given this limited authority, it is perhaps not surprising that the parties did not reach an agreement on October 13. According to Huh, and as corroborated by Cohen, talks stalled primarily because Kwon was not prepared to pay a $12.5 million earnest money deposit. (Huh Decl., ¶ 11; Cohen Aff., ¶ 5 ("the parties could not reach closure on an issue involving collateral security")). This was a non-negotiable term (or at least one from which Huh was not authorized to deviate). Huh states that when the meeting concluded he told Kwon that he had until 8:00 p.m. the following evening to confirm that he was prepared to pay the $12.5 million deposit or risk losing the deal. (*Id.*, ¶ 12). Although there is no record of whether Kwon responded, David Goldman, who attended the meeting as counsel for KAMCO, drafted a letter agreement immediately following the meeting memorializing the events of the day. (*See* October 13, 2000 letter from Hanbo to AK Capital B.V. ("Goldman Letter"), attached as Ex. A to Huh Decl.).

Although Huh characterizes the Goldman Letter as nothing more than a "convenient way of memorializing the terms that . . . Kwon had placed on the table," the Letter reveals that the October 13 negotiations were quite serious. (Huh Decl., ¶ 13). Like Kwon's September 30 letter, the Goldman Letter suggests that the terms of any private sale would have closely tracked the failed March 8, 2000 Nabors SPA, *i.e.* Kwon would step into the shoes of the Consortium, albeit through an entity he controlled, "AK

Capital B.V."[7] The Letter also reveals that Kwon and KAMCO discussed – and perhaps agreed in principle upon – a total earnest money deposit of $12.5 million, subject to his ability to produce commitment letters satisfactory to Hanbo's creditors. At the same time, it is clear that the Goldman Letter was *not* intended to be binding on the parties; to the contrary, it was to take effect only if, by November 15, 2000, (i) AK Capital B.V. made an initial earnest money deposit of $5 million; (ii) the parties agreed on the form of a binding "definitive agreement," and (iii) the terms of the sale received the approval of Hanbo's creditors and the Bankruptcy Court in Korea. (*Id.*, p. 2).

Although it is undisputed that these conditions were never met, there is some evidence that the parties continued to work towards a private sale after the October 13 meeting. For example, Cohen states that – at some point after October 13 – he wrote KAMCO with a "proposal seeking to bridge the gap" that separated the parties. In response, Cohen received a communication from Nathan Nahm of Hughes Hubbard and Reed LLP, another of KAMCO's legal counsel, indicating that there was still a chance the Kwon private sale would go through. According to Cohen, this exchange prompted a "two-week telephone dialogue," an effort that was directed at finalizing the terms of the deal. (Cohen Aff., ¶ 8). Declarations from KAMCO executives also support the conclusion that the creditors were serious about a private sale. Jae-Ho Park, an Executive Director at KAMCO familiar with the discussions, notes that "[f]rom November 2000 [to] Spring 2001" Kwon and his representatives "repeatedly requested meetings to discuss their proposal to purchase Hanbo's assets." (Nov. 24, 2004 Decl. of Jae-Ho Park

---

[7] The Goldman Letter is both addressed to AK Capital, B.V. and expressly notes that the purpose of the letter is to "set forth the terms under which [Hanbo] proposes to sell certain of its assets to AK Capital B.V." (Goldman Letter, p. 1).

("Park Decl."), ¶ 8). Park also notes that Kwon made a formal presentation to the Joint Management Committee in December 2000, which, as noted, included representatives from Hanbo's twelve largest creditors. (*Id.*, ¶ 8). Finally, Park states that Kwon met with Hanbo's creditors in Korea as late as March and April of 2001, suggesting that the parties were still discussing a private sale to Kwon as late as that spring. (*Id.*, ¶ 12).

Despite these efforts, it is undisputed that the Kwon deal was not consummated. According to Park, the Joint Management Committee ultimately concluded that a private sale might be illegal, and in any case felt it would have been "unfair to other potential investors." (Park Decl., ¶ 8). On this basis, the Committee informed AK Capital B.V. that it was now planning to sell Hanbo's assets through a second public auction (the "Second Auction"). (*Id.*). Before discussing the Second Auction in more detail, the Court will address a point of some confusion, namely, whether the plaintiff in this case, AK Capital LLC, was a party to the proposed private sale discussed at the October 13, 2000 meeting and into the spring of 2001. (*Id.*). Resolution of that question will bear on the availability of the "commercial activity" exception to FSIA immunity, as discussed more fully, *infra*.

## E.    AK Capital B.V. and AK Capital LLC

Aside from the obvious fact that both AK Capital LLC and AK Capital B.V. were presumably named for A̲lex K̲won, there is nothing to suggest that AK Capital LLC was involved in the October 13, 2000 meeting. To begin, it appears from the record before the Court that the two entities are legally distinct. AK Capital LLC is a Delaware limited liability corporation, and, judging by its name, AK Capital B.V. is a foreign corporation,

16

presumably registered in the Netherlands.[8]  Moreover, it appears that AK Capital LLC

had not been incorporated as of October 13, 2000, and therefore could not have

participated in the meeting held in New York.  According to Murphy, he and Kwon co-

founded AK Capital LLC only after it became clear that "a private sale could not be

consummated," which could not have been until sometime after the October 13 meeting,

and perhaps as late as April 2001.  (Murphy Decl., ¶ 13).[9]  On this basis, and because

there is no other evidence in the record that AK Capital LLC was represented at the

October 13, 2000 meeting, the Court finds that the company was not directly involved in

Kwon's private offer to assume the Nabors SPA, which was the sole purpose of the

October 13, 2000 meeting.  Rather, as acknowledged by Murphy, AK Capital LLC was

formed to participate in the Second Auction, to which the Court now turns.

### F.    The Second Auction

Having concluded that a private sale would not be possible, Hanbo's creditors

commenced the Second Auction in July 2001.  Unlike the First Auction, the Second was

conducted largely through the creditors' financial advisor, Lehman Brothers Korea ("LB

Korea").  The process was as follows.  On July 27, 2001, LB Korea distributed bidding

instructions to various potential investors, including AK Capital.  (Choi Decl., ¶ 34).

Bidders were required to submit their bids to LB Korea, and were asked to direct all

---

[8] Corporations ending in "B.V." are generally registered with the Netherlands' tax authority.

[9] Although Murphy contends that he and Kwon co-founded AK Capital LLC, there is significant evidence that Kwon was AK's single "active" member. (*See, e.g.,* Murphy Decl., pp. 2, 3, 7 (characterizing Murphy as a "co-found[er]" of AK); Choi Decl., ¶¶ 8, 22; Memorandum of Understanding, attached as Ex. 2 to Choi Decl.).  At various points in the record, including in documents submitted by AK Capital in connection with the Second Auction, Kwon is described as AK Capital's "manager," (Murphy Decl., p. 7), its "President and only active member," (Choi Decl., p. 7), its "General Partner, Member/Manager, Trustee or Officer," (Memo. of Understanding, attached as Ex. 5 to Choi Decl.), and its "Chairman and Chief Executive Officer." (Memo. of Understanding, attached as Ex. 9 to Choi Decl.).

17

communication regarding the bidding process in the same manner. (Choi Decl., ¶ 31). All bidders were required to submit a $1 million non-refundable bidding deposit prior to participating in the first round of the auction, which was to be non-binding on the participants.

AK Capital LLC submitted a non-binding bid of $400-$450 million and was selected as a final bidder. In order to proceed to the final round, which would be binding, AK Capital was required to enter into a "bidding" memorandum of understanding ("Bidding MOU"), which set forth the procedures for the final bid. (Bidding MOU, attached as Ex. 5 to Choi Decl.). Kwon executed AK Capital's Bidding MOU on August 23, 2001. (Choi Decl., ¶ 36). Several months later, LB Korea sent AK Capital and the other final bidders an Addendum to the Amended Bidding Instructions for the proposed asset sale. (Amended Bidding Instructions, attached as Ex. 7 to Choi Decl.). The Amended Bidding Instructions required the successful final bidder to pay an earnest money deposit of $10 million, comprising a $1 million refundable deposit to be submitted with the bid, and an additional $9 million to be deposited if selected as the winning bidder. (*Id.*, p. 2).

On November 30, 2001, AK Capital submitted its binding bid, along with the required $1 million deposit. (Choi Decl., ¶ 43). Shortly thereafter, in December 2001, AK Capital was selected as the winning bidder, subject to certain conditions and the approval of the Bankruptcy Court. (*Id.*, ¶ 44). That approval came on March 25, 2002. (*Id.*) The next day, on March 26, AK Capital and Hanbo entered into a Memorandum of Understanding to purchase Hanbo's assets (the "Purchase MOU"). Under the terms of the Purchase MOU, along with the Amended Bidding Instructions, AK Capital was

required to deposit an additional $9 million with an escrow agent, which, together with the $1 million bidding deposit, constituted the required – and non-refundable – earnest money deposit (the "EMD"). (February 12, 2003 Sale and Purchase Agreement, p. 1, attached as Ex. 29 to June 10, 2004 Decl. of Jinsu Yune ("Yune Decl.")). On April 1, 2002, AK Capital deposited the remaining $9 million of the EMD in an escrow account in Korea.

Over the next nine months, AK Capital conducted due diligence with respect to Hanbo and began negotiating a purchase agreement. Near the end of that process, in December 2002, the Bankruptcy Court unexpectedly announced that it would not approve a draft purchase agreement unless the EMD was increased by $27.7 million. (Choi Decl., ¶ 52). After AK Capital and the Creditor Board asked the Court to reconsider, the Court agreed to an additional deposit of $17 million, payable in two installments. (Choi Decl., ¶ 56). AK Capital accepted this compromise, and promised to deposit the additional earnest money by May 12, 2003 ("the Second EMD"). This Second EMD was to be fully refundable should the parties fail to execute a final sale.

On February 12, 2003, AK Capital entered into the final Asset Sale and Purchase Agreement (the "Final SPA") for the purchase of Hanbo's assets. (SPA, attached as Ex. 18 to Choi Decl.; see also Choi Decl., ¶ 59). Among other things, the Final SPA required AK Capital to provide the Bankruptcy Court with proof of financing for the entire purchase price by July 1, 2003. On the day of that deadline, July 1, AK Capital approached LB Korea and asked for an extension. (Choi Decl., ¶¶ 65-72). The Trustee then submitted AK Capital's request, along with a supporting opinion from LB Korea, to the Bankruptcy Court. The Court granted the request, and on July 11, 2003, a side

19

agreement was executed to memorialize the terms of the extension: AK Capital was given until August 18, 2003 to deposit the balance of the purchase price, and one-half of the additional $17 million EMD was made non-refundable in the event that AK Capital missed the second deadline. (See Side Agreement, attached as Ex. 21 to Choi Decl.).

As the second deadline approached, on August 13, 2003, AK Capital again approached LB Korea to ask for an extension, this time until October 17, 2003. Although the Bankruptcy Court expressed dissatisfaction with the delay, and also had significant concerns that AK Capital would never be able to obtain the necessary financing, the Court again granted AK Capital's extension request. (Choi Decl., ¶ 78). Shortly thereafter, on August 19, 2003, a second side agreement was executed, pursuant to which AK Capital was given until November 18, 2003 to finalize payment. (Second Side Agreement, attached as Ex. 25 to Choi Decl.). As a penalty for missing the August 18 deadline, one-half of the $17 million Second EMD was "released to Hanbo." (Choi Decl., ¶ 78).

As the Bankruptcy Court feared, AK Capital would again struggle to secure financing, and would therefore request a third extension. Under the circumstances, and after concluding that AK Capital had not shown a substantial likelihood that it could obtain the required financing in a reasonable amount of time, the Court refused this third request. (Choi Decl., ¶¶ 82-88). The day after the final deadline passed, on November 19, 2003, Hanbo informed AK Capital that the SPA was terminated and collected the balance of the Second EMD as a penalty.[10]

This lawsuit followed, along with KAMCO's motion to dismiss.

---

[10] Hanbo ultimately conducted a third international auction. INI Steel Co. and Hyundai HYSCO were the successful bidders. (Choi Supp. Decl., ¶7).

## DISCUSSION

### A.    The FSIA Framework

As noted at the outset, KAMCO claims that it is immune from suit in this jurisdiction pursuant to the FSIA because it is a "Korean government agency charged by Korean law with aiding Korean financial institutions in danger of collapse." (Song Decl, p. 2). In making this argument KAMCO correctly points out that the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (quotation marks and citations omitted); *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 138-39 (2d Cir. 2001). KAMCO is also correct that, pursuant to 28 U.S.C. § 1604, the FSIA grants absolute immunity to "foreign states," subject to the exceptions set forth in Sections 1605 through 1607.[11] The threshold question, of course, is whether KAMCO is a "foreign state" within the meaning of Section 1604.

Section 1603(a) provides, in pertinent part, that a "'foreign state' . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." Subsection (b) then states:

An "agency or instrumentality of a foreign state" means any entity-

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

---

[11] Sections 1605 and 1607 of Title 28 provide some exceptions to the general rule of sovereign immunity, such as (i) where a foreign state waives immunity; (ii) where a suit arises from commercial activity conducted by the foreign state in the Unites States, or where commercial activity conducted anywhere has a direct effect in the United States; (iii) in cases involving the violation of property rights in contravention of international law; or (iv) where a suit consists of counterclaims made against a foreign state that initiates litigation. 28 U.S.C §§ 1605, 1607. Only the second of these exceptions is relevant here; it will be addressed *infra*.

(3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country.

28 U.S.C. § 1603(b). As noted, *supra*, KAMCO is a corporation organized under the laws of the Republic of Korea, and therefore satisfies the first and third prongs of Section 1603(b). (KAMCO Act, Art. 7). With respect to the second prong, KAMCO does not assert that it is a political subdivision, or that a majority of its stock is *directly* owned by the Korean government, as is required by the Supreme Court's decision in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003).[12] Thus, the only way KAMCO can qualify as a "foreign state" within the meaning of Section 1604 is if it is "an organ" of the Korean government.

Several principles will guide resolution of that issue. First, the term "organ" should be interpreted broadly to reflect Congress' intent that it be "difficult for private litigants to bring foreign governments into Court, thereby affronting them." *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 640 (9th Cir. 2003). For example, the House Report issued in connection with the FSIA provides that:

> entities which meet the definition of an "agency or instrumentality of a foreign state" could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.

---

[12] Although the Korean government owns a 42.8% of KAMCO's shares, and the KDB owns an additional 28.6% of the shares, in *Dole Food Co.* the Supreme Court held that 1603(b)(2)'s "majority ownership" clause does not allow for the "tiering" of corporate subsidiaries. This essentially means that, even if the KDB is considered to be an "agent or instrumentality" of Korea, its 28.6% stake in KAMCO cannot be aggregated with Korea's *direct* 42.8% ownership share for purposes of the majority-ownership prong of Section 1603(b)(2). *Dole Food*, at 473; *see also Filler v. Hanvit Bank*, 378 F.3d 213, 218-220 (2d Cir. 2004) (noting that *Dole Food* resolved a circuit split to hold that "tiering" is not allowed under the majority-ownership prong of Section 1603(b)(2)). For purposes of the present motion, then, *Dole Food* and *Filler* mean that the Korean government owns *at most* 42.8% of KAMCO, which is clearly not enough to satisfy the majority ownership requirement.

22

H.R.Rep. No. 94-1487, at 15-16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604,

6614; *see also EIE Guam Corp.,* 322 F.3d at 640.

Second, a party claiming immunity need *not* initially establish by a preponderance

of the evidence that it is an "agent or instrumentality of a foreign state" under Section

1603(b); rather, the entity need initially only make a *prima facie* showing. *Virtual*

*Countries, Inc. v. Republic of South Africa,* 300 F.3d 230, 241 (2d Cir. 2002) ("[I]n a

challenge to FSIA subject matter jurisdiction, the defendant must present a 'prima facie

case that it is a foreign sovereign'") (quoting *Cargill,* 991 F.2d 1012, 1016). Once that

showing is made, the opposing party then "has the *burden of going forward* with

evidence showing that, under exceptions to the FSIA, immunity should not be granted."

*Cargill,* at 1016 (emphasis added); *accord Drexel Burnham Lambert Group Inc. v.*

*Comm. of Receivers for A.W. Galadari,* 12 F.3d 317, 325 (2d Cir. 1993), *cert. denied,*

511 U.S. 1069 (1994). Determining whether the opposing party has met this burden

"involves a 'review [of] the allegations in the complaint, the undisputed facts, if any,

placed before [the court] by the parties, and – if the plaintiff comes forward with

sufficient evidence to carry its burden of production on this issue – [resolution of]

disputed issues of fact.'" *Virtual Countries,* 300 F.3d at 241 (quoting *Robinson v. Gov't of*

*Malaysia,* 269 F.3d 133, 141 (2d Cir. 2001)). Finally, if that burden is met, the "ultimate

burden of persuasion" shifts back to the party claiming immunity. *Cargill,* 991 F.2d at

1016 (emphasis added); *Robinson,* 269 F.3d at 141 n.8. This final burden must be met by

a preponderance of the evidence. *Id.; Virtual Countries, Inc.,* 300 F.3d at 241-42.

## B.  Is KAMCO an Organ?

There is no definitive test for determining whether an entity is an "organ" for purposes of Section 1603(b)(2); to the contrary, because entities that are within reach of 1603(b)(2) are likely to be quasi-governmental in character – in other words, they are likely to share characteristics both with governments or their agencies and non-governmental entities – the analysis is necessarily *ad hoc*. But that is not to say that it is without structure. To the contrary, the Second Circuit has identified several factors as relevant to the inquiry, including:

(1) whether a foreign state created the entity for a national purpose;

(2) whether a foreign state actively supervises the entity;

(3) whether a foreign state requires the entity to hire public employees and pays their salaries;

(4) whether the entity holds exclusive rights to some right in a [foreign] state; and

(5) whether the entity is treated as a governmental organ under the laws of a foreign state.

*Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (*citing Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846-47 (5th Cir. 2000)). Interestingly, the Second Circuit applied these factors in *Filler* to conclude that another Korean entity, the Korea Deposit Insurance Corporation ("KDIC), which bears certain similarities to KAMCO, *was* an organ of a foreign state. (*Id.*).

Both sides acknowledge that the foregoing factors, as applied in *Filler*, will guide this Court's analysis of KAMCO's entitlement to FSIA immunity. Both also recognize that *Filler* invites district courts to engage in a balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in favor of, or

against, the entity claiming FSIA immunity. *See Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 847 (5th Cir. 2000) ("although [the five *Filler* factors] provide a helpful framework, we will not apply them mechanically or require that all five support an organ-determination"). Relying on these principles, plaintiffs argue that "it is clear that . . . the FSIA . . . is wholly inapplicable to insulate KAMCO from liability." (Opp. Memo., p. 12). Defendants disagree, contending that "KAMCO easily qualifies as an organ of the Korean government under [the *Filler*] factors." (Mot. to Dismiss, p. 16). In resolving the dispute, the Court will address the factors *seriatim.*

### 1. Was KAMCO Created For a National Purpose?

There is overwhelming evidence in the record that KAMCO was established by the Republic of Korea for a national purpose, namely, to rescue Korean financial institutions by purchasing and disposing of non-performing loans at prices in excess of what the loans would be worth on the open market. (*See, e.g.,* KAMCO Act, Arts. 1, 6). KAMCO was first established on April 6, 1962 with passage of the Korea Development Bank Act as a subsidiary of the Korea Development Bank ("KDB"). As noted, *supra,* in 1997 the Korean government passed the KAMCO Act – which expanded and redefined KAMCO's purpose – in response to the Asian financial crisis. Article I of the Act provides that KAMCO was created for a quintessential government purpose, to "contribute to the development of the financial industry and the national economy through improving the liquidity and soundness of financial institutions." To that end, the Act gives KAMCO exclusive authority over the Resolution Fund, which is itself funded by the issuance of government-guaranteed bonds.

There can be no question that the preservation and development of the financial industry and financial markets are national goals, whether those ends are achieved by the disposition of non-performing loans or otherwise. In *EIE Guam Corp.*, for example, the Ninth Circuit held that the Japanese Resolution and Collection Corporation ("RCC") was immune from suit under the FSIA because, among other things, it was "expressly [created] to perform a public function," namely, to "purchase, administer, collect and dispose of non-performing loans purchased from failed financial institutions." *EIE Guam Corp.*, 322 F.3d at 640-41. It is undisputed that KAMCO serves an almost identical function in Korea.

Plaintiffs respond that – *even if* KAMCO was created in part to serve a national purpose – it is more like a private for-profit corporation than it is an organ of a foreign state because KAMCO has a competing purpose, to earn and distribute profits. (Pl. Opp., pp. 13-15). As described more fully above, KAMCO has some ability to earn profits and in fact earned modest profits in 2003. But distribution of those profits is significantly restricted, and any profits attributable to the re-sale of non-performing loans acquired using the Resolution Fund are not reflected in KAMCO's financial statements, and are payable to entities that contributed money to the Resolution Fund, not to KAMCO's shareholders.[13] In any event, the Court does not consider KAMCO's limited ability to make and distribute profits necessarily inconsistent with its national purpose. That is to say, as long as KAMCO was created for and continues to serve a national purpose – which it clearly does – the Court sees no reason why KAMCO's profitability should preclude FSIA immunity. Rather, it simply means that KAMCO does not have as its

[13] As noted, these loans are acquired at above market prices, which is further evidence that KAMCO's primary purpose is a public and not a private one. (Song Decl., ¶ 12).

*exclusive* purpose a national one. This is simply not inconsistent with the first *Filler* factor, or with the purpose of the FSIA, especially given Congress' intent that the term "organ" be interpreted broadly. Indeed, as the Ninth Circuit noted in *EIE Guam Corp.*:

> Congress' statement in the legislative history that a "state trading company" and "an export association" can be "organs" of a foreign state indicates Congress' belief that an entity's involvement in commercial affairs does not automatically render the entity non-governmental.

*EIE Guam Corp.,* 322 F.3d at 641 (citations and internal quotation marks omitted). Neither, in this Court's opinion, should KAMCO's limited ability to make a profit, in and of itself, preclude it from being an "organ" of the Korean government. To the contrary, given the strong national purpose underlying KAMCO's creation, the Court finds that the first *Filler* factor weighs heavily in favor of the conclusion that KAMCO is an organ of the Korean government.

### 2. Does the Korean Government Actively Supervise KAMCO?

There is substantial evidence in the record that the Korean government actively oversees and supervises KAMCO. As is more fully explained in the Court's factual findings, *supra*, Korea's Financial Supervisory Commission (the "FSC") directly supervises KAMCO, including by exercising *ex post facto* control over the election of KAMCO's CEO, as well by appointing or removing KAMCO's statutory auditor. (Song Decl., ¶ 17; KAMCO Act, Art. 47). KAMCO is also subject to audit by the National Assembly and is periodically audited and inspected by the Board of Audit and Inspection, "the government body responsible for auditing all government agencies." (*Id.*). The Government also exercises direct control over KAMCO through its presence on the Management Committee, which must pass all resolutions concerning and amendments to

27

KAMCO's operational policies and budgets. (KAMCO Act, Art. 14.). As noted above, the Management Committee is composed of public officials from the FSS, Ministry of Planning and Budgeting, and Ministry of Finance and Economy (the "Ministry Members"). *Id.*, Art. 15.

Plaintiffs offer no real opposition to any of these points; that is to say, plaintiffs do not contend that KAMCO is *not* subject to significant government control and oversight.[14] Accordingly, the Court finds that this factor also weighs in favor of the conclusion that KAMCO ought to be considered an organ of the Korean government for FSIA purposes.

### 3. Does the Korean Government Require that KAMCO Hire Public Employees and, If So, Does It Pay their Salaries?

There is little evidence in the record relevant to the third *Filler* factor, which asks "whether the foreign state requires the hiring of public employee and pays their salaries." *Filler*, 378 F.3d at 217. To begin, there is no evidence that the KAMCO Act requires KAMCO to "hire" public employees. At best, there is an argument that – by creating the Management Committee – the Act requires KAMCO to retain public officials to oversee its operations. But these officials are presumably not "employees" of KAMCO; nor is it entirely clear from the record that they are paid *by* KAMCO for their services, however one characterizes them. It does, however, appear that KAMCO's employees may be

---

[14] In an effort to provide additional support for the second *Filler* prong, KAMCO also claims that it is subject to government control by virtue of the fact that the government is its largest shareholder. In order to make this claim, KAMCO argues that, although "tiering" cannot be used to establish majority ownership for purposes of Section 1603(b)(2), "tiered" majority ownership can bear upon the question of government oversight. That is to say, defendant argues that the Korean government has a majority stake in KAMCO, a position it claims to hold by virtue of its direct 42.8% ownership stake, and the KDB's 28.6% stake (collectively, 71.6%). Although not without merit, this argument adds little to the analysis given the undisputed evidence that the Korean government exercises a great deal of *direct* control over KAMCO, for example through the FSC's veto power and its role on the Management Committee.

considered public employees for some purposes under certain Korean laws. (Yune Reply Decl., ¶¶ 12-18; Song Decl., ¶¶ 15-18). But, at the same time, it does not appear that the government actually pays KAMCO's employees' salaries. And it is not particularly relevant that under the KAMCO Act the Korean government "may, when it is deemed necessary to support the performance of KAMCO's services, make a capital investment in KAMCO or support necessary expenses." (KAMCO Act, Art. 9(3); Reply Memo., pp. 7-9). The more pertinent question is whether KAMCO *must* hire employees that *are* paid by the government. There is no evidence that it must. Accordingly, the Court finds that the third *Filler* factor does not support the conclusion that KAMCO is an "organ" of the Korean government.

### 4. Does KAMCO Hold Exclusive Rights in Korea?

The fourth *Filler* factor turns on whether KAMCO holds exclusive rights in Korea. It clearly does. Under Article 9 of the KAMCO Act, KAMCO has the exclusive right to use the Resolution Fund to acquire and dispose of non-performing loans. (Song Decl., ¶ 9). Both KACMO and the Resolution Fund were created by statute and are operated to perform a public benefit. This factor therefore weighs heavily in KAMCO's favor.

### 5. Is KAMCO Treated as a Private or Public Entity Under Korean Law?

The final *Filler* factor – whether KAMCO is treated as an agency of the Korean government under Korean law – is the focus of plaintiffs' claim that KAMCO is not an organ of the Korean government. The thrust of plaintiffs' argument is that, for most purposes, KAMCO is treated as any "independent corporate entity under Korean law." (Opp. Memo., pp. 12-13). In support of this proposition, plaintiffs note that tort claims

29

against KAMCO are governed not by the Korean State Compensation Act ("KSCA"), but rather by the Korean Civil Act ("KCA"), a statute which plaintiffs claim "governs *private* parties and entities." (Kim Decl., p. 19) (emphasis in original). According to plaintiffs' expert, that distinction is important because the KSCA is equivalent to the United States Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*. In other words, plaintiffs argue that if KAMCO were a government agency, it would be subject to suit in Korea, if at all, pursuant to the KSCA. Finally, plaintiffs point to the fact because the government owns less than 50% of KAMCO, it is not subject to the Korean Framework Act on the Management of Government-Invested Institutions ("FAGII").

While KAMCO may be treated as a private entity in some circumstances, it is also clear that, in several others, it is treated as an agency of the Korean government under Korean law. For example, KAMCO is subject to suit under the Korean Administrative Act ("KAA") (along with other government agencies) under certain circumstances; and, contrary to plaintiffs' position, its actions can also subject the Korean government to suit under the KSCA. (Reply Memo., p. 8; Yune Reply Decl., ¶¶ 5(b), 11(a), (b), 26). Although KAMCO is not subject to the FAGII, neither is the KDIC, an entity that has been found by the Second Circuit to be an organ of the Korean government. *Filler*, 378 F.3d, at 217; (Yune Reply Decl., ¶¶ 5(a), 18)). Both KAMCO and the KDIC are subject to the Korean Framework Act on the Management of Government-*Affiliated* Institutions (FAGAI), (Id., ¶¶ 5(a), 18), although, as plaintiffs

note, this is true of a number of entities that may or may not be deemed to be organs of the state, such as the Korea Railway Facility Corporation. (Second Kim Decl., ¶ 27).[15]

Plaintiffs also argue that KAMCO is not an organ because KAMCO's *employees* and *officials* are considered to be private individuals under most circumstances, the acknowledged exception being certain actions under the Korean Criminal Act. (*See* Kim Decl., ¶ 70). Indeed, plaintiffs argue that "[b]ecause the KAMCO Act refers to the criminal statute while deeming KAMCO officials as 'public officials,' it also means that KAMCO officials are considered officials of private institutions in all other matters, including lawsuits" such as this one. (*Id.*). In response, KAMCO acknowledges that its officials are treated as private citizens for some purposes, but notes that its officials are also "considered by law to be officers of the Korean Tax Authority and of the Korean Customs Authority," at least when those officials are "performing auctions of property seized by those agencies and are subject to civil administrative actions in those capacities." (Reply Memo., p. 9; see also, Yune Reply Decl., ¶¶ 5(c), 11(a), (b)).

Keeping in mind that this final factor – and, indeed, this whole analysis – is not an all-or-nothing proposition, the Court draws the following conclusion from this debate. While it is certainly relevant that KAMCO officials are amendable to suit in their individual capacity for certain purposes, it is more important that they are subject to suit as government officials for other purposes because *truly private* individuals would *never* be subject to suit as government officials. The same goes for KAMCO itself – truly private corporations would never be subject to suit as a government entity, or subject the

---

[15] It is entirely unclear from the *Filler* decision whether the Second Circuit considered the FAGII/FAGAI distinction in reaching its decision that the KDIC was an organ of the Korean government. In any event, the Court does not consider this fact to be critical to its finding that, based on the entire record, KAMCO is entitled to FSIA immunity.

Korean government itself to suit, whether under the KAA or the KSCA. In other words, it simply does not follow that KAMCO is *not* an organ of the Korean government for purposes of FSIA immunity simply because it is subject to suit alongside private Korean corporations.

Nonetheless, it is evident that KAMCO is treated as both a public and a private entity under Korean law. For this reason, this final *Filler* factor weighs neither heavily for nor heavily against a finding that KAMCO is an organ of the Korean government.

### 6. Conclusion

Eschewing a mechanical application of the *Filler* factors, and considering the extensive record in its entirety, the Court concludes that KAMCO has clearly established that it is an organ of the Korean government, and is therefore immune from suit under the FSIA (unless one of the enumerated exceptions applies). KAMCO was created by statute in 1962 and modified by statute in 1997; it is largely funded by and financially dependant on the government of Korea, which directly or indirectly (through the KDB) owns more than 70% of its outstanding shares; KAMCO has exclusive control over the Resolution Fund, which is funded by government-backed bonds; it is directly supervised by the FSC, which reports to the President of Korea, as well as several other agencies of the Korean government; it is exempt from paying certain taxes, such as acquisition and securities transaction taxes, and also potentially benefits from any other tax relief that the national or local governments deem "necessary" for its welfare; its management committee is composed of officials from Korea's Ministry of Finance and Economy, Ministry of Planning and Budgeting, the Korea Development Bank, and the Financial Supervisory Service; and, perhaps most significantly, KAMCO has a quintessentially "public"

mission, to service and stabilize the Korean economy by efficiently disposing of non-performing loans and restructuring failing corporations. *Filler*, 378 F.3d at 220 ("ensuring the stability of the South Korean banking system" is a "public function" supporting a finding that the KDIC is an organ of the Korean government); *Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir. 2001) (the ultimate question for purposes of FSIA "organ" status is "whether the entity engages in a public activity on behalf of the foreign government.").

Plaintiffs' arguments to the contrary, which focus on KAMCO's ability to earn limited profits and the fact that, like private entities, it is subject in many circumstances to suit under the KCA, do not substantially alter this balance. Plaintiffs have not rebutted KAMCO's showing that, at least for some purposes, it is treated as a government agency under Korean law. And, as noted, *supra*, there is nothing in the text of the FSIA to suggest that KAMCO's ability to make a profit *ipso facto* precludes the conclusion that it is an organ of the Korean government for purposes of Section 1603(b)(2). This proposition is supported by the House Report associated with the FSIA, which indicates Congress' view that "agenc[ies] or instrumentalit[ies]" of a foreign state might take any of several forms, many of which are inherently "commercial" in nature. *EIE Guam Corp.*, 322 F.3d at 640-641. In any case, the more pertinent question is what happens to those profits. KAMCO has introduced evidence that any profits on the non-performing loans it purchases (at above market prices) are not even reflected in its financial statements; neither are they are returnable to KAMCO's shareholders, instead going to institutions that contributed money to the Resolution Fund.

The Court's conclusion that KAMCO is an organ of the Korean government is

further supported by the Second Circuit's *Filler* decision. In observing that the KDIC is

an organ of the Korean government, the court explained that:

> The District Court correctly concluded that the KDIC is an organ of a
> foreign state because the KDIC was formed by statute (the Korea
> Depositors Protection Act) and presidential decree, it performs functions
> traditionally performed by the government (protecting depositors and
> promoting financial stability), has its directors are [sic] appointed by the
> Ministry of Finance and Economy; its president appointed by the President
> of the Republic of Korea; and many of its operations overseen by the
> Ministry of Finance and Economy.

*Filler*, at 217. Like the KDIC, KAMCO was formed by statute and presidential decree,

performs functions typically performed by the government (ensuring financial stability

through the management of a public fund), has a Management Committee appointed by

the government, and has many – if not most – of its operations directly supervised by the

government.

## C.    The Commercial Activity Exception

The remaining question, then, is whether the "commercial activity" exception to

FSIA immunity applies. The "commercial activity" exception is codified at 28 U.S.C. §

1605(a)(2) and provides, in pertinent part:

> (a) A foreign state shall not be immune from the jurisdiction of courts of
> the United States or of the States in any ease -
>
> . . .
>
> (2) in which the action is based upon a commercial activity carried on in
> the United States by the foreign state; or upon an act performed in the
> United States in connection with a commercial activity of the foreign state
> elsewhere; or upon an act outside the territory of the United States in
> connection with a commercial activity of the foreign state elsewhere and
> that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Plaintiffs have the burden of coming forward with evidence demonstrating that Section 1605 applies, subject to the following principles of law. *Robinson v. Government of Malaysia*, 269 F.3d 133, 141 (2d Cir. 2001).

A "foreign state" is engaged in "commercial activity" under the FSIA "when it acts not in its governmental or public role, but rather as a private player in the marketplace." *United States Fidelity and Guaranty Co. v. Braspetro Oil Services, Co.*, 199 F.3d 94, 98 (2d Cir. 1999) (*per curiam*). KAMCO does not dispute that its role in the sale of Hanbo's assets required it to engage in a "commercial activity" within the meaning of Section 1605(a)(2). So the only question is whether any of AK Capital's claims against KAMCO in this lawsuit are "based upon" (i) commercial activity that was carried out *in the United States* by KAMCO; or (ii) an act performed by KAMCO *in the United States* in connection with some extraterritorial commercial activity.[16]

Reading the complaint broadly, plaintiffs bring three claims against KAMCO. The first arises out of alleged misrepresentations made by KAMCO, including statements regarding (i) KAMCO's ability to control the Second Auction (Compl., ¶¶ 10, 13); (ii) KAMCO's intention to provide guidance and assistance to AK Capital in the event its bid at auction was successful (Compl., ¶ 12-13); and (iii) the total amount of earnest money

---

[16] AK Capital does not argue that the third possible commercial activity exception applies, which would require it to produce evidence that this action is based upon some act done by KAMCO "in connection with a commercial activity" outside of the United States that "cause[ed] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). But even if it did, the Court would find that the allegedly tortuous activity at issue in this case did not have a "direct effect" in the United States because under the terms of the proposed asset sale KAMCO was not required to perform any act in the United States. *Texas Trading v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981) (decision to back out of contracts had a "direct effect" in the United States because the contracts required Nigeria to "present documents and collect money" here); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013 (2d Cir. 1991) ("direct effect" found where Bolivia was required to issue negotiable promissory notes to an intermediary in the United States); *cf. Republic of Argentina, Int'l Housing Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8 (2d Cir. 1989) (no "direct effect" where parties did not direct their relationship to the United States in any tangible way).

that AK Capital would be required to pay in connection with the auction (Compl., ¶ 13). *See, also,* Murphy Deed, ¶¶ 13-15. Plaintiff's second claim is for conspiracy to defraud, and involves an alleged agreement between KAMCO and the Trustee to sabotage AK Capital's bid at the Second Auction so that the creditors could keep the earnest money, and so that the Trustee could bid on the assets himself. (Compl., ¶¶ 21-22). Plaintiffs' third claim – for interference with the SPA entered into between AK Capital and Hanbo – is also premised on the existence of a conspiracy between the Trustee and KAMCO in connection with the Second Auction. (Compl., ¶ 40).

Under Section 1605(a)(2), a cause of action is "based upon" commercial activity or acts performed in the United States if it includes "elements . . . that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993) (citations omitted). As the Second Circuit has clarified, albeit in the context of the third, "direct effect," prong of the exception:

> What does "based upon" mean? At a minimum, that language implies a causal relationship. Thus, at the least, the "act that caused a direct effect in the United States" . . . must be a "but for" cause of the . . . the ground of th[e] suit. That is, it must be true that without the [a]ct, there would be no [suit].

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000) (citation omitted). This interpretation of the phrase "based upon" is equally applicable to all three prongs of the test. *Id.* (noting that "it is not enough to find that the defendant committed some act 'in connection with a commercial activity of the foreign state elsewhere and that act cause[d] a direct effect in the United States.' We must also find that the plaintiff's suit in U.S. courts is 'based upon' that act."); *Reiss, 234* F.3d at 747 ("there must be a significant nexus . . . between the commercial activity in

[the foreign state] upon which the exception is based and a plaintiff's cause of action."').

So, to meet their burden under either of the first two prongs of Section 1605(a)(2), plaintiffs must come forward with evidence that KAMCO performed acts *in the United States* that, if proven, would entitle AK Capital to relief.

They have not done so. With respect to plaintiffs' second and third claims, (conspiracy to defraud; tortious interference with contract), there is no evidence (or even any allegation) that KAMCO performed any act *in* the United States, much less an act upon which the claims are based. The record is simply silent on that point. The first claim (for misrepresentation) suffers the same defect. Although the alleged misrepresentations are pled with greater specificity (Compl. ¶¶ 9-15), none are alleged to have occurred in the United States. Indeed, plaintiffs allege only one face-to-face meeting with KAMCO representatives in the United States, a meeting which occurred on October 13, 2000, and which had as its purpose the negotiation of a private sale of Hanbo assets to Alex Kwon. In his declaration, Murphy effectively concedes that the alleged misrepresentations were not made at this meeting. (Murphy Decl., ¶ 13). Specifically, Murphy asserts that the misrepresentations were made *after* it became clear that a private sale could not be consummated, and that the Second Auction would be held, which could not have been until well after the October 13 meeting in New York. (Id.).

This conclusion is not changed by the fact that, in a March 9, 2005 letter to the Court, plaintiffs' counsel describes the October 13, 2000 meeting as "pivotal," and suggests that the parties "reached an accord as to the key terms upon which AK Capital would acquire" Hanbo's assets, an accord which included the understanding that "the $10 million [EMD] . . . would be the maximum required for the transaction." (March 9, 2005

Letter from Herald Price Fahringer to the Court). To the extent this argument is applied to the alleged fraudulent inducement to bid at the Second Auction, it is directly at odds with Murphy's declaration and with the undisputed purpose of the October 13, 2000 meeting. (Murphy Decl., ¶ 12 ("[d]uring [the October 13, 2000] meeting, . . . KAMCO . . . considered a private sale of Hanbo Steel's assets to Alex Kwon"). Indeed, as of October 13, the Second Auction was not yet on the table, and AK Capital, which was formed to participate in that auction, did not even exist. (Id. ¶¶ 12-16).

So it simply cannot matter, as both Murphy and Cohen contend, that as a result of the October 13 meeting "it was apparent . . . that KAMCO was in charge and was making all the decisions concerning the sale of Hanbo Steel." (Murphy Decl., ¶ 12; Cohen Aff., ¶ 9 ("I believe that, in the course of the October 13, 2000 meeting . . . any reasonable person would have come to the conclusion that . . . KAMCO . . . was the real decision maker in connection with [the sale of Hanbo's assets]")). Neither could it be relevant that "the events of October 2000, . . . which played out within the United States, established the rules of engagement for future dealings with Hanbo." (Cohen Aff., ¶ 10). This lawsuit is based on alleged misrepresentations (and conspiracies) that occurred *after* October 13, 2000, at an unspecified location and in connection with the Second Auction, which means that KAMCO's conduct at the October 13 meeting is a red herring. *See, e.g., Nelson*, 507 U.S. at 358 (holding that plaintiff's claims for false imprisonment and battery in Saudi Arabia were not "based upon" the Saudi government's earlier act of recruiting him in the United States); *Human Rights in China v. Bank of China*, 2003 WL 22170648, at *5 (S.D.N.Y. Sept. 18, 2003) (action not "based upon" commercial activity in the United States where allegedly tortious communications were "performed in China"

but ultimately "sent to a party within the United States"); *Kern v. Oesterreichische Elektrizitaetswirtschaft Ag*, 178 F.Supp.2d 367, 377 (S.D.N.Y. 2001) (rejecting commercial activity exception claim where "[p]laintiffs s[ought] to substitute the mere 'connection' requirement . . . for the stringent nexus required by the 'based upon' language", but could not point to any act of defendant foreign sovereign occurring in the United States that gave rise to their claim); *Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F.Supp.2d 549, 559 (S.D.N.Y. 2001) (finding no commercial activity exception where there was no nexus between claims and activity allegedly giving rise to the exception).

Accordingly, because there is no nexus between any acts performed by KAMCO in the United States and plaintiffs' causes of action in this case, the exceptions to FSIA immunity set forth at 28 U.S.C. § 1605(a)(2) do not permit this Court to exercise jurisdiction over KAMCO.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted.

SO ORDERED.

Dated: New York, New York
    October 19, 2005.

Richard J. Holwell
United States District Judge